**E-FILED**
Friday, 03 January, 2014  04:50:59 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **THE GRIGOLEIT COMPANY,** | ) | |
| A Corporation, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 05-CV-2126** |
| | ) | |
| **WHIRLPOOL CORPORATION,** | ) | |
| A Corporation, | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

Plaintiff, Grigoleit Company, filed suit in state court in 2005 against Defendant, Whirlpool Corporation, seeking damages for an alleged breach of a Licensing Agreement between the parties.  The court entered an Opinion (#49) finding that, if Whirlpool was determined to be liable under the agreement, Grigoleit was entitled only to seek royalties from Whirlpool, not breach of contract damages.  An arbitrator has found Whirlpool to be liable, and the parties have filed cross Motions for Partial Summary Judgment (#57 and #55, respectively) asking the court to determine how royalties will be measured in this case.  Both parties have filed their Responses (#61, 60) to the cross Motions for Partial Summary Judgment.  By agreement of the parties no replies to the responses will be filed, and the matter is ready for judgment.  For the following reasons, Grigoleit's Motion for Partial Summary Judgment (#56, 57) is DENIED.  Whirlpool's Motion for Partial Summary Judgment (#55) is GRANTED in part and DENIED in part.  On November 27, 2013, Grigoleit filed an unopposed Motion for an Amended Scheduling Order

(#65).  That motion is GRANTED.

BACKGROUND

*Factual Background*

Whirlpool Corporation manufactures home appliances, including washers, dryers, refrigerators, dishwashers, stoves, ranges, and a variety of countertop appliances both domestically and across the globe.  Whirlpool's brands include Maytag, Jenn-Air, KitchenAid, and Amana.  Whirlpool manufactured products are sold nationwide at Sears stores under the Kenmore name.  Whirlpool has operations in multiple locations across North and South America, Europe, Asia, and Australia.  Grigoleit Company was a supplier of appliance components.  Grigoleit operated out of a facility in Decatur, Illinois, and over its history supplied knobs and decorative trim to the home appliance and automobile industries.  Grigoleit ceased production operations in 2009.

Robert Howie, Jr., is the president and general manager of Grigoleit, as well as its sole shareholder.  He began his career at Grigoleit in 1961 in the engineering and design department.  He earned a bachelor of science degree in industrial engineering from Northwestern University.  From 1970 to 2002, Howie was a registered professional engineer in three states.  Howie was the "primary driver" on approximately 30 or more patents issued to Grigoleit.  He was the inventor of the patents that were the subject of the license agreement being litigated here and essentially "ran engineering" and "did the pricing" for Grigoleit.  Joel Winick was a vice president of Grigoleit and had been Grigoleit's sales manager since 1985.  He would be responsible for the face-to-face contact and negotiation of agreements, in conjunction with Howie.  Winick handled Grigoleit's relationship with Whirlpool.

On April 16, 1985, the United States Patent Office issued Grigoleit U.S. Patent No. 4,510,666 (the '666 Patent) titled "KNOB WITH DECORATIVE END CAP AND METHOD OF MANUFACTURING IT."  On September 2, 1986, the U.S. Patent Office issued Grigoleit U.S. Patent No. 4,608,882 (the '882 Patent) titled "KNOB WITH DECORATIVE END CAP." Griogleit's patented technology was an assembly method addressed at getting away from glued assemblies for decorative caps of appliance knobs.  The patent describes a means by which decorative metal caps can be assembled to the body of a knob.  The technology and method obviated the need for gluing the cap to the knob and permitted efficiencies in assembly.

Whirlpool was a customer of Grigoleit's for many years.  In 1985 Whirlpool began sourcing its knobs, panels, and eventually dials to Grigoleit for its Main Line Whirlpool brand laundry appliances.  Prior to 1990, Whirlpool purchased knobs, knob assemblies, decorative metal panels, and other decorative trim from Grigoleit for use in laundry appliances manufactured and sold by Whirlpool.  After 1990, Whirlpool principally purchased molded plastic knobs and related components from Grigoleit.  Between 1985 and 1993, Grigoleit sold Whirlpool approximately 40 million knobs and knob assemblies that incorporated Grigoleit design and method patents and by 1991 the Whirlpool Main Line work alone constituted around 50% of Grigoleit's business.

In 1991 Whirlpool undertook a comprehensive review of its knob supplier base, called the Knob Optimization Program (KOP), the goal of which was to identify the most capable suppliers and weed out poor performers.  Grigoleit was removed from the knob supplier base as a result of the KOP and was informed that it would not be eligible to be considered for new knob programs.  Whirlpool selected as its preferred knob supplier Phillips Plastics Corporation.

Grigoleit tried to convince Whirlpool to reconsider its removal decision, beginning with writing a letter to Whirlpool's procurement department requesting to be reinstated into Whirlpool's knob supplier base.  Eventually, Bob Hall and Jerry Farrington, two high-ranking executives in Whirlpool's procurement department, agreed to meet with Grigoleit.  Hall and Farrington confirmed to Grigoleit that it was no longer eligible for new knob business, and that Grigoleit's "recourse within Whirlpool is exhausted."  Winick testified that "[w]e were toast at this point at Whirlpool in the knob supply base."

As of October 1992, Grigoleit was out of the knob supply base as far as being considered for any new programs, but was continuing to supply product that it had been previously supplying.  In fact, despite the results of the 1991 KOP, throughout all of 1992 Grigoleit continued to supply knobs and knob assemblies to Whirlpool in connection with its 1985 Main Line Whirlpool brand and the Roper and Estate brands.  At some point during 1992 Grigoleit learned that Whirlpool was going to launch, in 1993, a new version of the Main Line brand of laundry appliances, sourcing the knob and knob assembly work to Phillips.  It also learned that Whirlpool was  transferring manufacture of the Roper and Estate brand knobs to Phillips.  Grigoleit reminded Whirlpool of the importance of its technological capabilities in marrying plastic and metal, and noted that Whirlpool's new 1993 knob designs appeared to require those very capabilities.  Whirlpool denied any need for Grigoleit's patented technology or other capabilities.

However, in late 1992 Grigoleit claimed it discovered that Whirlpool's new design for the 1993 Main Line knobs, to be manufactured by Phillips, incorporated and relied upon Grigoleit's patented technology.  At about this time Grigoleit learned that the Roper and Estate

-4-

knobs that it was manufacturing for Whirlpool were being transferred to Phillips for manufacture but with no change in the design.  In January 1993, Grigoleit contacted Whirlpool and asserted that laundry knobs Whirlpool was purchasing from Phillips for the 1993 Whirlpool Main Line incorporated technology covered by Grigoleit's '666 and '882 Patents.[1]  Winick testified:

> "It was Grigoleit's objective to work out a resolution to the infringement that was beneficial to both parties.  And what was going to be beneficial to Grigoleit was more Whirlpool business.  And what was going to be beneficial to Whirlpool was they wouldn't have to pay us anything to use the patents, and they wouldn't have to defend themselves in court against it, and they wouldn't have to have their line shut down because of that action on a brand-new model line."

Farrington first attempted to have Phillips design around the patents in order to avoid having to enter into any agreement with Grigoleit, but Phillips was unable to do so in a timely manner.  Grigoleit made Whirlpool an offer to resolve the patent infringement issue that involved moving the 1993 Whirlpool laundry knobs from Phillips to Grigoleit.  Winick testified:

> "Whirlpool had told us that they were in the process of retooling the Estate and Roper knobs that Grigoleit was supplying at the time and doing so with Phillips Plastics in a way that apparently would have also infringed.  And so we offered to tool that program for the Phillips tool charge and at the Phillips prices and to tool the 1993 Whirlpool line for no charge and sell the parts to Whirlpool

---

[1]Whirlpool disputes that the Grigoleit patents in question were valid or that Whirlpool knowingly infringed on them.  Whirlpool denies prior knowledge of the patents and notes that the infringement issue has never been litigated and no discovery has ever been conducted on the issue.

at Phillips Plastics prices[.]"

Whirlpool rejected this offer and negotiations continued. Grigoleit continued to try to get Whirlpool to purchase a significant portion of the 1993 Whirlpool laundry knobs from Grigoleit by offering to allow Phillips free use of the patented technology as a parallel supplier. On March 9, 1993, Winick called Whirlpool to discuss possible resolution of the infringement problem and disclaimed any interest in a purely financial settlement. Whirlpool declined Grigoleit's offer. Instead, Whirlpool offered to allow Grigoleit to keep supplying knobs for the Roper and Estate line of laundry products, and would allow it to bid for knob business that Phillips "did not want or agreed [Grigoleit] could do better." Whirlpool also offered "full contact with engineering, sales, etc." which no other knob supplier except Phillips would have. Farrington knew that Grigoleit's goal, when negotiating the licensing agreements, was to obtain more business as opposed to money royalties.

By late March 1993 Farrington concluded that Whirlpool was "out of time" in terms of any design-around solution and he began to negotiate with Grigoleit to obtain the right to use Grigoleit's patented technology. Winick, for Grigoleit, and Farrington for Whirlpool, were the principal negotiators for the agreement. Whirlpool sent Grigoleit the first draft on March 29, 1993, which Grigoleit rejected. The draft stated, among other provisions:

> "Whirlpool shall not be obligated to pay Grigoleit any monies as royalties for the right, license and privilege granted herein so long as Whirlpool continues to purchase its requirement for Licensed Products for the 'Estate' and 'Roper' brand lines of automatic clothes washers and dryers sold by Whirlpool."

Grigoleit rejected this version because it did not obligate Whirlpool to purchase any

components from Grigoleit, including its requirements for certain Estate and Roper brand laundry appliances that used the licensed patents that Whirlpool elected to purchase - a fact that Farrington acknowledged but assured Grigoleit was simply an oversight.

On April 23, 1993, Grigoleit proposed a revised draft, written by Howie and Winick, that addressed royalties upon a termination of the agreement.  Under the April 23 draft, Whirlpool would have been obligated to purchase from Grigoleit its requirements for any "Components" that Grigoleit could demonstrate the capability to supply based upon ISO9001 standards[2] and that Whirlpool could not demonstrate the ability to obtain for a lower total cost from Phillips, the company Whirlpool had previously determined to be the lowest total cost knob producer.  The "Remedy Under Termination" section of the April 23 draft stated as follows:

> "If the "Terminating Party" is Whirlpool, Whirlpool shall pay Grigoleit Royalties of $.12 each for all "Knobs" purchased from parties other than Grigoleit as if this agreement had never been in force.  Whirlpool shall rendor [sic] a full accounting and payment of said Royalties to Grigoleit within sixty (60) days of the date of termination of this agreement.
>
> If the "Terminating Party" is Grigoleit, Whirlpool shall have Royalty free use of "Licensed Patents" on all "Knobs" purchased at any time both before and after such termination."

---

[2]ISO9001 refers to standards published by the International Organization for Standardization.  The ISO9000 standards are a family of standards related to quality management systems and designed to help organizations ensure that they meet the needs of their customers and other stakeholders while meeting statutory and regulatory requirements related to the product.  ISO9001 deals with the requirements that organizations wishing to meet the standards have to fulfill.  *ISO9000*, http://www.wikipedia.org/wiki/ISO_9000.

Winick testified that, under the proposed April 23 draft, if the agreement was terminated by Whirlpool, Whirlpool "would owe Grigoleit X amount per piece for everything they'd used retrospectively as if the agreement had never existed." Grigoleit proposed the termination provision because it wanted to "get something out of" Whirlpool's use of the product in the event Whirlpool stopped buying. Howie testified that Grigoleit proposed the royalty of $.12 for each knob because that was what "we considered to be reasonable for the value of that technology." During the meeting on the April 23 agreement draft, the parties had differing opinions on the value of Grigoleit's technology. Grigoleit believed, at the time, that the value was $.12 per part, based on its experience in the industry. Whirlpool disagreed with this valuation, with Farrington claiming the technology was worth only about $.01 a piece. Whirlpool rejected Grigoleit's proposed termination provision.

On April 28, 1993, Grigoleit submitted to Whirlpool a new proposed license agreement, which would have provided Whirlpool with the same release and license as it ultimately obtained in the final licensing agreement. The April 28 proposal would have relieved Whirlpool from the obligation to pay "any monies as royalties" but only so long as it continued to purchase from Grigoleit its requirements for the present styling of knobs for the Roper and Estate brand laundry appliances and, in Grigoleit's opinion, gave "serious consideration" to Grigoleit as a "niche supplier" of "various appliance components" whenever Grigoleit provided "more than 'parity' in technology, quality, service, delivery and price" in comparison with Phillips. The new proposal would have permitted termination of the agreement in the event of an uncured default after 60 days notice or if Whirlpool stopped purchasing its requirements for knobs using the licensed patents for its Roper and Estate brands. Whirlpool rejected this proposal because: (1) it provided

-8-

a "parity" comparison only against Phillips, which Whirlpool found to be too limited; and (2) it made Grigoleit the arbiter of reasonableness of Whirlpool's actions.

After receiving Whirlpool's comments regarding the April 28 draft, Grigoleit prepared a fourth draft agreement and tendered that proposal to Whirlpool for review on or about May 27, 1993. This draft substituted a neutral arbitration provision in place of Grigoleit determining Whirlpool's compliance with the "serious consideration" condition and made the "parity" comparison against "other qualified suppliers" rather than against Phillips alone. On June 11, 1993, the parties signed the May 27 proposal, which became the License Agreement (LA) in its final form. This is the LA at issue in this case. Winick signed on behalf of Grigoleit, and Farrington signed on behalf of Whirlpool.

In the LA Grigoleit granted Whirlpool the right and license to have made by Phillips, and to use and sell throughout the world "Licensed Product" covered by the claim of Grigoleit's "Licensed Patents" (specifically the knobs incorporating the '666 and '882 patents).

The LA included a section entitled "Royalties," which stated as follows:

> "Whirlpool shall not be obligated to pay Grigoleit any monies as royalties for the right, license, and privilege granted herein so long as Whirlpool continues to purchase from Grigoleit Whirlpool's requirement for present styling of knobs for the "Estate" and "Roper" brand lines of automatic clothes washers and dryers and so long as, in the opinion of an arbitrator established in accordance with the procedures of a recognized and independent arbitration service, Whirlpool continues to give serious consideration to Grigoleit by working with and purchasing from Grigoleit various appliance components, when in regards to such

components it is reasonable to believe Grigoleit can provide more than parity in technology, quality, service, delivery, and price in comparison to other qualified suppliers in the Whirlpool supplier base at such time."

The "right, license, and privilege granted herein" specifically referred to the right of Whirlpool to use and sell products containing the Licensed Patents, *i.e.* the '666 and '882 patents in certain knobs.

Grigoleit initiated the instant litigation in 2005, claiming that Whirlpool violated the terms of the LA, pursuant to which Grigoleit licensed Whirlpool to use two of Grigoleit's patents. The case was originally bifurcated: issues of liability, pursuant to the LA, were to be presented to an arbitrator, and issues of damages in the event of a liability finding were to be decided by the federal district court. On May 10, 2010, U.S. District Judge Michael P. McCuskey entered an Opinion (#49) granting Whirlpool's Motion for Partial Summary Judgment (#40). The court was asked to determine, in the event of Whirlpool's liability under ¶3 of the LA, whether Grigoleit could seek breach of contract damages from Whirlpool or was only entitled to royalties. The court found that, while Grigoleit had promised to let Whirlpool use its patented technology royalty-free, Whirlpool's continued "serious consideration" of Grigoleit as a future supplier was only a condition to Grigoleit's promise, and not a separate promise in and of itself. Therefore, in the event that the arbitrator finds that Whirlpool failed to give "serious consideration" to Grigoleit by working with and purchasing from Grigoleit various appliance components, Grigoleit would only be entitled to royalties from Whirlpool, and not breach of contract damages.

On August 8, 2013, the parties filed a Joint Status Report (#54) with the court. The

Report laid out the current procedural posture of the case and a proposed briefing schedule to determine the royalties issue.  The Report also briefly stated the parties' respective positions on the proper measure for royalties.  The parties both agreed that, if the arbitrator found Whirlpool was liable under the LA, three issues would remain to be resolved by the court: (1) how did the parties intend "monies as royalties" to be measured; (2) if royalties were intended to be measured as a per-part royalty, what method should the Court employ in determining that per-part figure; and (3) what is the amount of royalties owed under whatever method the Court deems appropriate?  The parties agreed that at least the first two questions could be resolved through cross-motions for summary judgment, but that the third question may require further discovery and the presentation of expert testimony.  However, the parties believed the court's resolution of the first two questions could significantly narrow the parties' disparate valuation of the case and "may lead to a settlement obviating the need for trial."  The parties stated they were open to a "court-supervised facilitative mediation or settlement conference prior to a bench trial on the amount of royalties due under the License Agreement[.]" On October 28, 2013, the arbitrator entered his decision and award finding that Whirlpool did not comply with ¶3 of the LA with regard to several product lines, thus finding Whirlpool liable to Grigoleit under the LA and necessitating a determination by this court of the proper measure of royalties.  The parties have now fully briefed this issue and the issue is ready for judgment.

## ANALYSIS

The court must determine the meaning of "monies as royalties" as used in the LA.  The court must also determine what method to be used to measure royalties in this case.  Grigoleit contends that the parties, in the LA, intended for "monies as royalties" to be measured "as the

value equivalent of the unfulfilled condition."  Specifically, Grigoleit wants royalties measured

as the lost opportunities it would have been provided had Whirlpool "seriously considered"

Grigoleit under the terms of the LA.  Whirlpool wants royalties measured as a "per-part" royalty.

Whirlpool, using factors enumerated by the court in *Georgia-Pacific Corp. v. United States*

*Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970), *mod. and aff'd*, 446 F.2d 296 (2nd Cir.

1971), argues in favor of a per-part royalty at the low end of a range between $.01 and $.12 per

part.

SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for

summary judgment, a district court "has one task and one task only: to decide, based on the

evidence of record, whether there is any material dispute of fact that requires a trial."  *Waldridge*

*v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court

must construe the evidence in the light most favorable to the nonmoving party and draw all

reasonable inferences in favor of that party.  See *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242,

255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  However, a court's favor

toward the nonmoving party does not extend to drawing inferences which are only supported by

speculation or conjecture.  See *Singer*, 593 F.3d at 533.  In addition, this court "need not accept

as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion."  *Nuzzi v. St.*

*George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. 2010) (emphasis in

original).

-12-

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge*, 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

I.      *Royalties Under the License Agreement*

A. Applicable Law

This case was removed to the federal district court via diversity jurisdiction under 28 U.S.C. § 1332. At the outset of the analysis, the parties are asking the court to interpret the LA to determine the meaning of the term "monies as royalties" from ¶3 of the LA. A federal court sitting in diversity will apply the choice-of-law provision contained in the contract at issue, unless the contract is silent on choice-of-law, in which case the court will apply the choice-of-law rules of the forum state to determine the applicable substantive law. See *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). Here, as noted in Judge McCuskey's prior opinion (#49), ¶10 of the LA designates Michigan as the governing state law.[3] Therefore, this court will

---

[3]"This License Agreement shall be interpreted and construed and the legal relations covered herein shall be determined in accordance with the laws of the State of Michigan."

interpret the LA pursuant to Michigan state law.

The law presumes that the parties to a contract understand the import of the contract and had the intention manifested by its terms. *Birchcrest Building Co. v. Plaskove*, 120 N.W.2d 819, 823 (Mich. 1963). To interpret the parties' intent, a court reads the agreement as a whole and attempts to apply the plain language of the contract itself. *Old Kent Bank v. Sobczak*, 620 N.W.2d 663, 666-67 (Mich. Ct. App. 2000). A fundamental tenet of contractual jurisprudence in Michigan "is that unambiguous contracts are not open to judicial construction and must be *enforced as written.*" *Rory v. Continental Ins. Co.*, 703 N.W.2d 23, 30 (Mich. 2005) (emphasis in original). Contracts are enforced according to their unambiguous terms because doing so respects the freedom of individuals to freely arrange their affairs via contract. *Rory*, 703 N.W.2d at 30.

However, where a contract is ambiguous, a factual question is presented as to the meaning of its provisions and the intent of the parties in entering the contract. *Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 453-54 (Mich. 2003). The trier of fact can consider extrinsic evidence in resolving a contract whose language is ambiguous. *Klapp*, 663 N.W.2d at 454. Admissible extrinsic evidence would include evidence of the contemporaneous understanding of the parties, such as the parties' conduct, representative statements, and past practices. *Klapp*, 663 N.W.2d at 454. Courts can also look to dictionary definitions of the terms at issue. See *Turner Holdings, Inc. v. Howard Miller Clock Co.*, 657 F.Supp. 1370, 1380 (W.D. Mich. 1987).

B.      The June 11, 1993 Licensing Agreement

The parties disagree as to the meaning of the term "monies as royalties" in ¶3 of the LA.

-14-

The parties did not explicitly define "royalties" in the LA.  Therefore, the court may turn to dictionary definitions and case law to determine the common understanding of the term.  *Mobil Oil Corp. v. Michigan Department of the Treasury*, 373 N.W.2d 730, 735 (Mich. 1985).  Webster's dictionary defines a "royalty," in the context of patented inventions, as "a payment made to an author or composer for each copy of a work or to an inventor for each article sold under a patent."  Merriam Webster's Collegiate Dictionary 1021 (10th ed. 1996).  Black's Law Dictionary defines "royalty" as "[a] payment made to an author or inventor for each copy of a work or article sold under a copyright or patent."  Black's Law Dictionary 1330 (7th ed. 1999).

The Michigan Supreme Court, relying on definitions from The Random House Dictionary and Black's, held that "the common understanding of 'royalties'" was a payment received by the owner of certain types of property, such as intangible property or natural resources, for use of that property.  *Mobil Oil*, 373 N.W.2d at 735-36; *Kelly Services, Inc. v. Treasury Department*, 818 N.W.2d 482, 486 (Mich. App. Ct. 2012).  "Under this common definition, then, royalty income derives from the transfer of *the right to use property*, not from the transfer of *possession of property*."  *Kelly Services*, 818 N.W.2d at 486 (emphasis in original).  Seventh Circuit case law has similarly defined "royalty," in the broad sense, as monetary payment to the owner for the use of the owner's patented or copyrighted work.  See *Stenograph Corp. v. Fulkerson*, 972 F.2d 726, 729 n.1 (7th Cir. 1992) (citing Black's Law Dictionary that royalties were generally defined as share of product or profit reserved by owner for permitting another to use his property); see also *Hazeltine Corp. v. Zenith Radio Corp.*, 100 F.2d 10, 16 (7th Cir. 1938) ("'Royalty,' when used in connection with a license under a patent, means the compensation paid by the licensee to the licensor for the use of the licensor's patented

-15-

invention. [citation omitted] This is substantially Webster's definition except that the latter adds 'usually at a certain rate for each article manufactured, used, sold, or the like.'").  Further, the term "monies" is defined by Black's as "(*pl.*) Funds; sums of money <investment moneys>. — Also spelled (in sense 4) *monies*."  Black's Law Dictionary 1021 (7th ed. 1999).  Therefore, the plain and ordinary meaning of royalties, under the dictionary definitions and prior Seventh Circuit case law, is some sort of financial compensation paid by the licensee of a patent to the licensor patent owner for use of the patent, usually at a certain rate for each product sold or manufactured.

The court finds that the term "monies as royalties," as contained in ¶3 of the LA, to be clear and unambiguous.  Having carefully reviewed the LA, the court finds no reason to not apply the common, plain, and ordinary meaning of the words "monies as royalties" to the phrase as used in ¶3.  In the context of the paragraph, Grigoleit was giving Whirlpool permission to use its patented technology without having to pay royalties.  However, as a condition of that promise, Whirlpool was to give "serious consideration" to Grigoleit as a supplier for other product lines.  If an arbitrator determined that Whirlpool failed to provide such "serious consideration," Whirlpool may then become obligated to pay Grigoleit "monies as royalties" for use of the product.  The LA provided, in ¶1A, that Grigoleit was granting Whirlpool the right and license to use and sell throughout the world its licensed product covered by the claims of the patents.  The royalties section of the LA corresponds to the sale of those licensed products covered by Grigoleit's patents, and allowed Whirlpool to not pay royalties for the sale of said licensed products.  Both Black's and Webster's, along with the Michigan courts and the Seventh Circuit, defined royalties as compensation paid to the patent holder or inventor for the use of the

-16-

article or product sold.  In accord with the dictionary definitions and case law, the court finds the

parties intended the phrase "monies as royalties" to mean a money payment for products sold

that were covered by the claims of Grigoleit's licensed patents at issue in the LA.  What is not

clear is the exact measure of royalties, whether it be a "per-part" or "lump sum" royalty.

Regardless, the LA is clear and unambiguous that the money royalty in question is explicitly tied

to the products sold by Whirlpool covered by Grigoleit's licensed patents (the '666 and '882

knob patents).

      Grigoleit proposes a definition of "monies as royalties" under the LA that is not

consistent with the traditional use of the terms nor is it consistent with the plain and ordinary

reading of the LA as determined by this court and Judge McCuskey in his prior Opinion (#49).

Grigoleit, in its Motion for Partial Summary Judgment (#57) argues that "'monies as royalties'

means the value of the work that Grigoleit was supposed to get under the License Agreement"

and asks this court to enter an order finding that "Whirlpool is liable for the payment of royalties

in an amount equal to the lost value of the business for which Grigoleit was not given 'serious

consideration' as required to satisfy the Prong 2 condition of the License Agreement."

Plaintiff's Motion for Partial Summary Judgment (#57), p. 16, 23.

      This proposed definition finds no support in the body of the LA.  The court understands

that Grigoleit placed great importance on receiving more business from Whirlpool.  However,

Grigoleit attempts to argue the royalty referred to "lost work," which included "various

appliance components" possibly not covered by the licensed patents at issue.  This definition

detaches royalties from the specifically licensed patents (the '666 and '882 knob patents) that it

was using royalty-free and instead expands royalties to cover the other supply lines (various

components) for which Whirlpool did not give "serious consideration" to Grigoleit. The "serious consideration" for other work is merely a *condition* to Grigoleit's promise to let Whirlpool use the patented technology royalty-free, the failure of which triggers royalties. There is no suggestion anywhere in the LA, however, that "monies as royalties" is meant to be lost work or profits that are unrelated to the licensed patents allegedly being infringed upon by Whirlpool. Such an interpretation would essentially mean that Whirlpool was guaranteeing or promising this "other work" to Grigoleit, whether through the "serious consideration" of actual business or in monetary form via royalties. The court has already determined such a promise was not made by Whirlpool. The court agrees with Whirlpool that an "appropriate measure of damages would compensate Grigoleit for the value of the patented technology Whirlpool used, not the lost profits Grigoleit wished it could have had on sales of products that had nothing to do with the patented technology and that Whirlpool had never promised to purchase." Whirlpool's Response to Grigoleit's Motion for Partial Summary Judgment (#60), pp. 25-26. Grigoleit's measure of royalties would, in essence, be the contract damages that Judge McCuskey found Grigoleit was not entitled to in his prior Opinion (#49). Grigoleit cannot execute an end run around Judge McCuskey's prior Opinion by recharacterizing royalties into another form of contract damages when the contract at issue did not so provide.

Further, Grigoleit's understanding of royalties is not the traditional, recognized standard definition of royalties as defined by Black's, Webster's, Michigan, or the Seventh Circuit. "As a general principal, [], the ordinary understanding of the word 'royalty' refers to payments of money based on a percent or count of designated types of transactions computed over a period of time." Raymond T. Nimmer and Jeff C. Dodd, Modern Licensing Law § 7:2 (Database Updated

September 2013).  If the parties intended a different meaning than the traditional and commonly accepted one, they did not include it anywhere within the four corners of the LA.  Therefore, the court concludes that the LA defines "monies as royalties" as a monetary sum to be paid by Whirlpool to Grigoleit based on the use and sale of the knobs covered by Grigoleit's licensed patents.  The LA does not measure "monies as royalties" as Grigoleit's lost work and opportunities due to Whirlpool's failure to seriously consider Grigoleit for other supply lines.

II.  *The Appropriate Measure of Royalties*

Although the court has determined that "monies as royalties," as defined in the LA, clearly and unambiguously refers to a monetary sum to be paid by Whirlpool to Grigoleit specifically for use and sale of products covered by Grigoleit's licensed patents, Whirlpool admits that the LA is "silent" as to whether the royalties are to be measured as a "per-part" royalty or another way, such as a lump-sum royalty.  In its Motion for Partial Summary Judgment (#55), Whirlpool argues that "[b]ased on the consideration of relevant evidentiary facts, including Grigoleit's own proposed terms during the parties' actual license negotiations, the money royalties should be calculated as a per-unit running royalty based on Whirlpool's usage of the patented technology."  Whirlpool's Motion for Partial Summary Judgment (#55), p. 2.  Grigoleit counters that, although it proposed a per-part royalty during negotiations, such a royalty was squarely rejected by Whirlpool at the time, which is why the final LA was silent as to the exact measure of royalties.  Grigoleit further argues that the application of federal patent infringement law, as embodied by the *Georgia-Pacific* factors, is erroneous in this case because it is a contract interpretation case, and the contract must be interpreted according to state law. The *Georgia-Pacific* factors do not apply, Grigoleit argues, because they are only applicable

where no contract exists, and the court must hypothesize the negotiations and agreement of the parties.  Here, Grigoleit contends, the parties reached an agreement, and the court should look only to the LA and Michigan state law to determine the measure of royalties.

      A.      A Reasonable Royalty

"In litigation, a reasonable royalty is often determined on the basis of a hypothetical negotiation, occurring between the parties at the time that infringement began."  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312 (Fed.Cir. 2011).  "A reasonable royalty is the predominant measure of damages in patent infringement cases."  *Uniloc*, 632 F.3d at 1312.  Black's defines a "reasonable royalty" as "[a] royalty that a licensee would be willing to pay the inventor while still making a reasonable profit from use of the patented invention."  Black's Law Dictionary 1330 (7th ed. 1999).  The Federal Circuit has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry.  *Uniloc*, 632 F.3d at 1317.  The *Georgia-Pacific* factors present a comprehensive list for a court to consider in fashioning a reasonable royalty in a patent infringement case, ranging from "the royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty" to the opinion testimony of qualified experts.  *Georgia-Pacific*, 318 F.Supp. at 1120.  The *Georgia-Pacific* factors properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue and certain factors in particular "remain valid and important factors in the determination of a reasonable royalty rate."  *Uniloc*, 632 F.3d at 1317-18.  However, evidence purporting to apply to these, and any other factors, must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time."  *Uniloc*, 632 F.3d at 1318.

-20-

The court is mindful of Grigoleit's argument that *Georgia-Pacific*'s situation is different from that facing this court. *Georgia-Pacific* was a pure patent-infringement case where the parties did not engage in actual negotiations that produced an actual license agreement, necessitating that the court construct hypothetical negotiations to reach a reasonable royalty. *Georgia-Pacific*, 318 F.Supp. at 1121-22. By contrast, in this case we do have evidence of negotiations and the parties did reach a final, binding contract. The court agrees with Grigoleit that this is, at its heart, a contract interpretation case. However, as noted above by the court, interpretation of the contract only gets the court so far. The LA only tells the court what is meant by "monies as royalties" in its most basic sense. The LA also informs the court that the parties' did not intend the definition of royalties advanced by Grigoleit in its Motion for Partial Summary Judgment (#57). However, the LA is silent as to the method for specifically measuring those royalties, such as whether royalties are to be "per-unit" or "lump sum," let alone whether such a per-unit royalty is a percentage or fixed-price royalty and the amount of that percentage or fixed-price. Therefore, in this unique factual situation, the court is left to the arguments of the parties in their briefs, the evidence of the negotiations leading up to the June 11, 1993 LA, and the case law to fashion an appropriate method for measuring royalties in this case.

B.     Whether A Per-Part Royalty Should Be Imposed

A per-part, or per-unit, royalty is paid based on the number of units ultimately sold (or made) which is directly related to product revenues. *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1330 (Fed. Cir. 2009). As more units are sold, more revenue is earned and more royalties are paid. *Lucent Technologies*, 580 F.3d at 1330. If a licensee chooses to omit the

patented feature from its commercial product, the licensee will generally owe no per-unit royalty. *Lucent Technologies*, 580 F.3d at 1330. Per-unit royalties, also known as running royalties, fall into one of two categories: fixed price per unit and percentage of revenue/sales/income, both of which differ from another form of royalty, the lump-sum payment. *Lucent Technologies*, 580 F.3d at 1330. The two "running royalties" or "per-unit" royalties measurement methods are described thusly:

> "The fixed price per unit method calculates royalties by fixing a dollar amount to the number of units of an item incorporating the licensed property that are sold or distributed. Thus: 'Licensee shall pay to Licensor a royalty equal to $2.50 per each Product Distributed that incorporates any of the Licensed Technologies.' [citation omitted] In contrast, the percentage of revenue/sales/income method reckons the royalty by applying a percentage (for example, 2% or 4%) to the proceeds, net or gross, [citation omitted] reaped from the distribution of the technology or product carrying or incorporating the licensed information." Raymond T. Nimmer and Jeff C. Dodd, Modern Licensing Law § 7:4 (Database Updated September 2013).

During the negotiations over the licensing agreement in March and April 1993, Grigoleit proposed a per-part royalty measurement of $.12 per knob covered by the Grigoleit patents. Howie testified that Grigoleit proposed the royalty of $.12 for each knob because that was what Grigoleit considered to be reasonable for the value of the technology. The proposed April 23 draft agreement stated that, if Whirlpool were the terminating party, "Whirlpool shall pay Grigoleit Royalties of $.12 each for all "Knobs" purchased from parties other than Grigoleit as if

this agreement had never been in force."  During the meeting on the April 23 agreement draft, the parties had differing opinions on the value of Grigoleit's technology.  Grigoleit believed, at the time, that the value was $.12 a part, based on its experience in the industry.  Whirlpool disagreed with this valuation, with Farrington claiming the technology was worth only about $.01 a piece because the technology would not be hard to work around.  Farrington also did not want to commit Whirlpool to "an ever increasing obligation."  Whirlpool rejected Grigoleit's proposed termination provision.

The extrinsic evidence in this case shows that the parties, although it was rejected by Whirlpool, did at one time contemplate a per-part royalty for the use of Grigoleit's patented technology.  Although Grigoleit now argues against its application, the evidence further shows that Grigoleit and Howie believed that a per-part royalty of $.12 per knob covered by Grigoleit's patents was a reasonable value for Grigoleit's technology based on Howie's extensive experience in the industry.  A per-part royalty is also the generally understood use of the term "royalty."  See Nimmer and Dodd, Modern Licensing Law § 7:2 (Database Updated September 2013) ("As a general principal, [], the ordinary understanding of the word 'royalty' refers to payments of money based on a percent or count of designated types of transactions computed over a period of time.").  Because there is actual evidence in record of the parties' consideration of a per-part royalty, the court finds no need to resort to the *Georgia-Pacific* factors to hypothesize negotiations on this issue.  Therefore, based on the extrinsic evidence and the generally accepted measure of royalties, the court finds that a per-part royalty is the appropriate method for measuring royalties in this case.

C.    Type of Per-Part Royalty

-23-

There are two types of per-part royalties: fixed price and percentage.  In the instant case, the extrinsic evidence during the negotiation of the LA, particularly the April 23, 1993 draft, show that Grigoleit proposed a $.12 per part, or fixed price, royalty.  Whirlpool, in its Motion for Partial Summary Judgment (#55), advocates the application of a per-part fixed price royalty of $.01 to $.12 per part.  The court agrees that the evidence shows that, during the negotiations that ultimately produced the LA, the parties at least considered a per-part fixed price royalty.  There is no evidence the parties' considered a percentage based royalty, or at least none that has been submitted to the court and highlighted by the parties.  Further, just as in the above section, because there is actual evidence in record that the parties considered, at least at one time, a fixed-price per-part royalty to be an appropriate measure of royalties owed under a license agreement, the court sees no reason to consult the *Georgia-Pacific* factors to determine this issue.

D.      Amount of Per-Part Fixed Price Royalty

The remaining issue to be determined is the amount of the fixed price royalty.  Whirlpool proposes, and the court agrees, that based on the April 1993 negotiations of the parties, the royalty price per part range between $.01 and $.12 is reasonable.  Whirlpool requests that the court go further and set a particular per-part royalty based on the relevant *Georgia-Pacific* factors.  The court, however, agrees with Grigoleit's assertion that "[t]he purpose of this round of motion practice [] was not to determine what the royalty amount would be, but to determine 'the method' to be used."  The court further agrees with Grigoleit that this aspect of Whirlpool's motion "preempts discovery of these matters[.]" Grigoleit's Response (#61) to Whirlpool's Motion for Partial Summary Judgment, p. 2.  Therefore, the court will not determine in this opinion the amount of the fixed price royalty.  Further, the court will not limit itself at this time

-24-

by determining which *Georgia-Pacific* factors it will or will not consider in a determination of a particular per-part price.  The parties will conduct further discovery on the remaining issues in this case: what should be the specific per-part price, in a range between $.01 and $.12, and what should be the total amount of royalties owed under this measurement by Whirlpool to Grigoleit.

The court would like to draw the parties' attention to the fact that the court's decision will be based upon market forces and factors from twenty years ago and other considerations that may be difficult to ascertain.  The parties are directed to provide thorough, substantial, and comprehensive evidence to support their argument as to the proper price per part in the event that the parties are unable to reach an agreed amount and the matter proceeds to bench trial.

III.    *Grigoleit's Motion for An Amended Scheduling Order (#65)*

On November 27, 2013, Grigoleit filed a Motion for an Amended Scheduling Order (#65), unopposed by Whirlpool, seeking to amend the discovery schedule in the following way:

(1) Lay discovery shall continue until 60 days after the court issues its opinion on the cross motions for summary judgment.

(2) Expert reports will be exchanged within 30 days after the close of lay discovery.

(3) Expert depositions will occur on or before 30 days following the exchange of reports.

The court agrees that such a schedule may be necessary in light of this opinion, and that this opinion may effect and change how the parties are conducting discovery.  Therefore Grigoleit's Motion for an Amended Scheduling Order (#65) is GRANTED.

IT IS THEREFORE ORDERED:

(1) Grigoleit's Motion for Partial Summary Judgment (#56, 57) is DENIED.

(2) Whirlpool's Motion for Partial Summary Judgment (#55) is GRANTED in part and

DENIED in part.  The phrase "monies as royalties," as contained in the License Agreement of June 11, 1993, refers to monetary payments to be made by Whirlpool to Grigoleit related to Whirlpool's use and sale of products containing parts covered by Grigoleit's licensed patents. The court determines that the method for measuring royalties is to be a per-part fixed price royalty of a range between $.01 and $.12.  The court leaves open the specific price of said royalty and the total amount of royalties owed by Whirlpool to Grigoleit.

(3)  Grigoleit's Motion for an Amended Scheduling Order (#65) is GRANTED.  The parties will conduct further discovery on the issues that remain unresolved and pending in this case.  The amended discovery schedule is as follows:

(A) Lay discovery shall continue until 60 days after the court issues its opinion on the cross motions for summary judgment.

(B) Expert reports will be exchanged within 30 days after the close of lay discovery.

(C) Expert depositions will occur on or before 30 days following the exchange of reports.

(4) The parties are directed to contact the court, at their convenience, to arrange a status conference to discuss the case or to set a date for a settlement conference, supervised mediation, or bench trial.

ENTERED this 3rd day of January, 2014.

s/ COLIN S. BRUCE
U.S. DISTRICT JUDGE